Defendant Paul E. Bryant appeals a judgment of the Court of Common Pleas of Coshocton County, Ohio, which granted a divorce to plaintiff J. Elaine Bryant, allocated the separate property of the parties, divided the marital property, and allocated the parental rights and responsibilities for the parties' two children. Plaintiff cross-appeals on certain issues. The merits of the divorce are not in dispute, but rather, only financial issues are before this court.
Appellant assigns six errors to the trial court:
ASSIGNMENTS OF ERROR
 I. THE TRIAL COURT ERRONEOUSLY FOUND THAT MR. BRYANT FAILED TO TRACE HIS SEPARATE PROPERTY INTEREST IN VARIOUS COMMINGLED INVESTMENT AND RETIREMENT ACCOUNTS.
 A. THE TRIAL COURT'S DECISION TO REQUIRE "SPECIFIC TRACKING" OF MR. BRYANT'S SEPARATE PROPERTY INTEREST IN THE PRUDENTIAL/ADVEST INVESTMENT ACCOUNTS, AS OPPOSED TO TRACING BY MATHEMATICAL CONCEPTS OR GENERALLY ACCEPTED ACCOUNTING PRINCIPALS [SIC], WAS CONTRARY TO OHIO LAW.
 B. THE TRIAL COURT'S DECISION TO REQUIRE "SPECIFIC TRACKING" OF MR. BRYANT'S SEPARATE PROPERTY INTEREST IN THE KEOGH RETIREMENT ACCOUNT, AS OPPOSED TO TRACING BY MATHEMATICAL CONCEPTS OR GENERALLY ACCEPTED ACCOUNTING PRINCIPALS [SIC], WAS CONTRARY TO OHIO LAW.
 C. THE TRIAL COURT'S FINDINGS AS TO THE "MARITAL" VALUE OF THE ADVEST/KEOGH (PROFIT SHARING) PLAN, THE PRUDENTIAL IRA, AND THE BANK ONE CHECKING ACCOUNT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 II. THE TRIAL COURT'S ORDER OF CHILD SUPPORT REQUIRING THE APPELLANT TO PAY THE SUM OF $9,400.00 PER MONTH PER CHILD FOR THE SUPPORT OF THE PARTIES' TWO MINOR CHILDREN, AND IN ADDITION, FUND A LIFE INSURANCE TRUST AT AN ANNUAL PREMIUM COST OF $39,996.00 IS CONTRARY TO LAW, CONSTITUTES AN ABUSE OF DISCRETION BY THE TRIAL COURT, IS NOT SUPPORTED BY THE EVIDENCE, AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 A. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DID NOT STRICTLY COMPLY WITH OHIO REV. CODE 3113.215 IN COMPLETING THE CHILD SUPPORT COMPUTATION WORKSHEET AND IN COMPUTING THE AMOUNT OF THE CHILD SUPPORT OBLIGATION OF THE APPELLANT.
 C. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN APPLYING AN INCORRECT LEGAL STANDARD AS TO THE DETERMINATION OF THE AMOUNT OF THE CHILD SUPPORT OBLIGATION OF MR. BRYANT.
 D. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ORDERING AN AMOUNT OF CHILD SUPPORT IN EXCESS OF THE REASONABLE NEEDS AND THE STANDARD OF LIVING OF THE CHILDREN AS ESTABLISHED BY THE EVIDENCE ADDUCED AT TRIAL.
 E. THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION BY ORDERING AN AMOUNT OF CHILD SUPPORT BASED UPON A RATIONALE OF GIVING BOTH PARENTS THE EQUAL OPPORTUNITY TO INDULGE THE CHILDREN AND PROVIDE THE CHILDREN WITH LUXURIES.
 F. THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR IN MAKING AN UPWARD DEVIATION IN THE AMOUNT OF CHILD SUPPORT AND IN FAILING TO MAKE AN ORDER OF CHILD SUPPORT LOWER THAN THAT REQUIRED UNDER OHIO REV. CODE 3113.215 (B)(2)(b).
 III. THE TRIAL COURT'S FINDING THAT THE ENTIRETY OF THE "MILLIGAN RECEIVABLE" WAS MARITAL ASSET WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 A. FACTS RELEVANT TO LOWER COURT'S ERRONEOUS FINDING THAT THE "MILLIGAN RECEIVABLE" WAS A MARITAL ASSET WORTH $958,381.
 B. THE TRIAL COURT SHOULD NOT HAVE CHARACTERIZED THE "MILLIGAN RECEIVABLE" AS A MARITAL ASSET BECAUSE ALL OF THE EVIDENCE AT TRIAL DEMONSTRATED IT WAS NOT COLLECTIBLE AND THERE WAS NO CREDIBLE EVIDENCE WHICH WOULD HAVE SUPPORTED THE TRIAL COURT'S FINDING THAT IT WAS WORTH ITS FACE VALUE OF $958,381.
 C. THE TRIAL COURT'S DECISION TO IGNORE THE EXISTENCE OF A SUBSTANTIAL MARITAL LIABILITY CONSTITUTES REVERSIBLE ERROR.
 D. THE EVIDENCE OFFERED BY MR. BRYANT'S EXPERT SHOULD HAVE BEEN ADMITTED, AND WOULD HAVE FURTHER ESTABLISHED MILLIGAN'S INABILITY TO PAY BOTH HIS OBLIGATIONS UNDER THE PROMISSORY NOTE AND HIS LOAN FROM THE OHIO BANK FOR WHICH MR. BRYANT WAS A GUARANTOR. HAD THIS TESTIMONY BEEN ADMITTED, THE TRIAL COURT WOULD HAVE HAD FURTHER EVIDENCE THAT THE PROMISSORY NOTE WAS WORTHLESS AND THAT THERE WAS, INSTEAD, A SUBSTANTIAL MARITAL DEBT.
 IV. IF THE TRIAL COURT'S FINDING AS TO THE "MILLIGAN RECEIVABLE" WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE, THEN ITS DENIAL OF MR. BRYANT'S POST TRIAL MOTION FOR PARTIAL RELIEF FROM JUDGMENT WAS CONTRARY TO OHIO LAW.
 A. FACTS RELEVANT TO THE LOWER COURT'S DENIAL OF MR. BRYANT'S MOTION FOR PARTIAL RELIEF FROM JUDGMENT.
 B. CIVIL RULE 60 (B)
 C. IF THE LOWER COURT'S FINDING AS TO THE "MILLIGAN RECEIVABLE" IS NOT REVERSED ON APPEAL, THEN MR. BRYANT IS ENTITLED TO RELIEF IN ACCORDANCE WITH OHIO CIV. R. 60 (B) (1) BECAUSE MILLIGAN'S BANKRUPTCY UNEQUIVOCALLY REVEALS THAT THE "MILLIGAN RECEIVABLE" WAS MISTAKENLY TREATED AS A "MARITAL ASSET".
 D. IF THE LOWER COURT'S FINDING AS TO THE MILLIGAN RECEIVABLE IS NOT REVERSED ON APPEAL, THEN MR. BRYANT IS ENTITLED TO RELIEF FROM JUDGMENT IN ACCORDANCE WITH OHIO CIV. R. 60 (B)(2) BECAUSE NEWLY DISCOVERED EVIDENCE OF MILLIGAN'S INSOLVENCY COULD NOT HAVE BEEN DISCOVERED IN TIME TO MOVE FOR A NEW TRIAL UNDER OHIO CIV. R. 59 (B).
 E. IF THE LOWER COURT'S FINDING AS TO THE MILLIGAN RECEIVABLE IS NOT REVERSED ON APPEAL, THEN MR. BRYANT IS ENTITLED TO RELIEF FROM JUDGMENT IN ACCORDANCE WITH OHIO CIV. R. 60 (B)(4) BECAUSE MILLIGAN'S BANKRUPTCY RENDERS IT NO LONGER EQUITABLE THAT THE JUDGMENT HAVE PROSPECTIVE APPLICATION.
 F. IF THE LOWER COURT'S FINDING AS TO THE MILLIGAN RECEIVABLE IS NOT REVERSED ON APPEAL, THEN MR. BRYANT IS ENTITLED TO RELIEF FROM JUDGMENT IN ACCORDANCE WITH OHIO CIV. R. 60 (B)(5) BECAUSE, ASSUMING HE DID NOT SATISFY ANY OF THE REQUIREMENTS OF 60 (B)(1), (2) OR (4), THE MILLIGAN BANKRUPTCY IS, INDEED, A SUFFICIENT OTHER REASON JUSTIFYING RELIEF FROM JUDGMENT.
 V. THE PORTION OF THE LOWER COURT'S JUDGMENT ENTRY REQUIRING MR. BRYANT TO PAY MRS. BRYANT $200,000 FROM HIS SEPARATE PROPERTY TO REIMBURSE HER FOR COSTS FOR THE MARITAL HOME WAS CONTRARY TO OHIO LAW.
 A. FACTS RELEVANT TO THE LOWER COURT'S ERRONEOUS DECISION TO REQUIRE MR. BRYANT TO REPAY MRS. BRYANT $200,000 SPENT ON CONSTRUCTION COSTS FOR THE MARITAL HOME.
 B. THE LOWER COURT ERRONEOUSLY TREATED THE EXPENDITURE OF MRS. BRYANT'S SEPARATE FUNDS ON BUILDING COSTS FOR THE MARITAL HOME AS A LOAN.
 C. ASSUMING, ARGUENDO, THAT THE CONVERSATION BETWEEN THE PARTIES WITH REGARD TO THE USE OF MRS. BRYANT'S $200,000 TOWARDS CONSTRUCTION COSTS OF THE MARITAL HOME DID CONSTITUTE A LOAN AGREEMENT, THE LOWER COURT IMPROPERLY DOUBLE PAID HER BY NOT SUBTRACTING THIS $200,000 PURPORTED OBLIGATION FROM THE VALUE OF THE HOME WHEN CALCULATING MARITAL EQUITY.
 VI. THE TRIAL COURT'S DISTRIBUTION AND TREATMENT OF THE APPRECIATION OF MR. BRYANT'S SEPARATE PROPERTY INTEREST IN THE "FARMER'S EXCHANGE," "STAGE BUILDING," AND "MAURICE BUILDING" WAS CONTRARY TO OHIO LAW.
 A. FACTS RELEVANT TO THE LOWER COURT'S ERRONEOUS DECISION AND TREATMENT OF THE APPRECIATION ON MR. BRYANT'S INVESTMENT PROPERTIES.
 B. THE TRIAL COURT SHOULD NOT HAVE FOUND THE APPRECIATION IN THE "FARMER'S EXCHANGE" AND "MAURICE BUILDING" TO BE A MARITAL ASSET BECAUSE THERE WAS INSUFFICIENT EVIDENCE OF ANY MARITAL CONTRIBUTION OR LABOR GIVING RISE TO SUCH APPRECIATION.
 C. EVEN ASSUMING, ARGUENDO, THAT THE APPRECIATION IN VALUE OF THE INVESTMENT PROPERTIES IS MARITAL, THE TRIAL COURT FAILED TO OFFSET OR AVERAGE APPRECIATION WITH DEPRECIATION IN DETERMINING THE AMOUNT, IF ANY, TO BE ALLOCATED AS A MARITAL ASSET.
On cross-appeal, appellee assigned five errors:
CROSS ASSIGNMENTS OF ERROR
 ASSIGNMENT OF ERROR NO. 1
 THE TRIAL COURT ABUSED ITS DISCRETION AND ISSUED A DECISION AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BY FAILING TO PROPERLY IDENTIFY AND DIVIDE ALL OF THE MARITAL APPRECIATION OF THE HUSBAND'S SEPARATE PROPERTY.
 ASSIGNMENT OF ERROR NO. 2
 THE TRIAL COURT ABUSED ITS DISCRETION AND ISSUED A DECISION AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BY ORDERING AN INSUFFICIENT AMOUNT OF CHILD SUPPORT AND BY FAILING TO PROPERLY UTILIZE THE HUSBAND'S EARNINGS ABILITY IN THE CALCULATION OF CHILD SUPPORT.
 ASSIGNMENT OF ERROR NO. 3
 THE TRIAL COURT ABUSED ITS DISCRETION AND ISSUED A DECISION AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BY VALUING THE PARTIES' PROPERTY AT ITS APPRAISED VALUE RATHER THAN THE ACTUAL CONSTRUCTION COST WHICH EVIDENCED THE TRUE VALUE OF THE MARITAL ASSET.
 ASSIGNMENT OF ERROR NO. 4
 THE TRIAL COURT ABUSED ITS DISCRETION AND ISSUED A DECISION AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN IT FAILED TO AWARD THE APPELLANT ANY BENEFITS FROM CERTAIN COAL RESERVES ON THE "DUNCAN FARM" PROPERTY.
 ASSIGNMENT OF ERROR NO. 5
 THE TRIAL COURT ABUSED ITS DISCRETION AND ISSUED A DECISION AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BY FAILING TO ORDER INTEREST ON THE MONIES ORDERED TO BE PAID BY THE HUSBAND TO THE WIFE.
The record indicates the parties were married some four and one-half years, and produced two children. At the time of the marriage, appellant was 52 years old and appellee was 28 years old. Appellant was a successful businessman with broad financial holdings. Appellee had operated an unsuccessful business, which, despite appellant's contributions of $130,000 to $140,000 of marital funds into the business, failed. The trial court found appellant had made somewhat in excess of $2,000,000 per year, in the earlier years of the marriage, but the year the parties were divorced appellant made slightly over $1,000,000. The court found because appellant was self-employed, he was able to manipulate his income, lowering it during the divorce. At the time of the divorce, the parties were in the process of constructing their dream home, although it appears the family never actually resided there. The parties entered into an agreed shared parenting plan, and it is not at issue here.
The trial court determined at the end of the marriage the combined assets of the parties, including separate and marital property, were in excess of $13,600,000. In its divorce decree, the trial court allocated $1,140,980 to appellant as her separate property. Nearly $900,000 of this came from gifts appellant had given her during the course of the marriage. The trial court awarded separate property to appellee, worth slightly more than $8,000,000. The trial court determined the remaining $4,336,472 was marital property, and split it between the parties. Appellant received various vehicles and farm equipment, real estate, and miscellaneous investments and bank accounts as well as some marital furnishings and accounts receivable, amounting to slightly more than $4,000,000. Appellee's share amounted to slightly over $242,000. The court found the division of marital property favored appellant by more than $3,700,000, so the court, to equalize the property division, directed appellant to pay $2,060,324 to appellee within 60 days. Appellant sums the distribution up by alleging appellee was awarded $3,443,829 in cash and assets for a four and one-half year marriage.
The trial court then computed appellant's child support obligation, and found appellant had an annual gross income of somewhat in excess of $1,000,000 while appellee had an annual gross income of slightly less than $24,000 per year. The court ordered appellant to pay the sum of $9,400 per month per child as child support. Additionally, the trial court ordered appellant to continue to fund a life insurance trust already in existence designed to provide benefits of at least $1,000,000 for each child in the event appellant died prior to the child's emancipation. The trial court found appellant had to pay nearly $40,000 as the annual premium for the life insurance trust. Appellant also provided health care insurance coverage for the children. Appellee did not request, and did not receive spousal support.
 I
In his first assignment of error, appellant argues the trial court improperly failed to trace his separate property interests in various investment and retirement accounts. The trial court found appellant had brought to the marriage a certain amount of stock, and established the value of the stock prior to the marriage. The parties stipulated to some of the values, and on other counts, the value was uncontroverted. The trial court found new marital money was added to some of the accounts, and withdrawn throughout the marriage. The trial court found appellant had failed to trace any of the assets in the accounts from the pre-marital status to the time of the divorce. The trial court concluded any monies not traceable during the time of the marriage should be treated as marital property.
Appellant argues the trial court erred in finding appellant had the burden of tracking the funds, and argues his expert witness had traced the funds by mathematical concepts and generally accepted accounting principles. Appellant also argues the court's finding as to the marital value is against the manifest weight of the evidence.
Appellant correctly cites us to R.C. 3105.171, which provides commingling of separate property with other property does not destroy the identity of the separate property unless the separate property is not traceable. Appellant's expert witness, Ms. Warren, prepared tracing summaries which purported to track pre-marital securities, or funds generated from the sale of the pre-marital securities. Ms. Warren computed nearly $600,000 which she found was traced back to pre-marital property. Appellant concedes the marital dollars and pre-marital dollars were commingled, and securities were sold and replaced in varying quantities. Appellant suggests an analytical methodology had to be utilized to re-construct the pre-marital portfolio and the passive appreciation from the portfolio. Ms. Warren assumed as each non-marital security was sold, the funds generated from its sale purchased a replacement non-marital security. She utilized the in-first out-first methodology by computing that the first funds in, namely the pre-marital funds, were the first funds out to buy new securities.
Appellant's argument ignores the fact that, at least for certain of the accounts, the amounts fluctuated below the pre-marital level, and then were brought back up by indisputably marital funds.
We find the trial court did not err in finding appellant had the burden of establishing any funds he claimed as pre-martial, and further, that Ms. Warren's testimony was insufficient to identify those funds. R.C. 3105.171 provides passive income or appreciation acquired from separate property by one spouse during the marriage remains the separate property of that person. However, here, the evidence placed before the trial court supports its conclusion the funds in the accounts did not represent passive income and appreciation, but rather, were the result of the investment of marital funds and labor expended on those accounts during the marriage. Pursuant to R.C. 3105.171, this comprises marital property.
Appellant correctly cites C.E. Morris Company v. FoleyConstruction Company (1978), 54 Ohio St.2d 279, as authority for the proposition a judgment supported by competent and credible evidence going to all the elements of the case must not be reversed as against the manifest weight of the evidence, syllabus by the court.
We have reviewed the record, and we find the trial court's decisions regarding the various assets are sustained by sufficient competent and credible evidence.
The first assignment of error is overruled in whole.
 II
Appellant next challenges the trial court's order of child support. The court required appellant to pay the sum of $9,400 per month per child, and to fund a life insurance trust on behalf of the children should appellant die before the children are emancipated. Appellant argues the trial court's order is contrary to law, against the manifest weight of the evidence, and an abuse of discretion.
At the time of trial the children were ages three and four. The trial court prepared the child support guideline worksheet pursuant to R.C. 3113.215. The trial court found appellant's situation permitted him to manipulate his income, and found the income appellant reported for the year in which the divorce occurred was substantially lower than the previous years. R.C. 3113.215 permits a court to impute income to a parent whom the court finds underemployed, as potential income. The court may impute income based upon potential and probable earnings, as well as from non-income producing assets which could generate income. The trial court also did not consider the lump-sum award given to the mother as a potential source of income. In computing the parties' income, the trial court used the amount of $1,057,031 for appellant's income and $23,880 for the appellee. The court computed that appellant had 98 percent of the family income.
The Ohio Child Support Guidelines tops out at $150,000 combined income, and for two children at this income level, provides for 14.65% of the total combined income to be payable for the children's support.
The trial court found it was just, appropriate, and in the best interest of the children to require appellant pay child support of $18,800 per month. The court found it would be unhealthy for the children to be in a situation where appellant had vastly disproportionate assets with which to provide the children with extras. The trial court found it was necessary to, in effect, to equalize the bargaining power of the parents with regard to the children.
Appellee notes one may readily calculate the basic child support award by taking 14.65% of $1,074,611 (the parties' combined income), which comes to $13,109.21 per month of which the appellant would be responsible for 98%. The basic child support award for these two children would then be $12,856.83 per month per child.
We find the trial court erred in its preparation of the Ohio Child Support Guidelines Worksheet. The court used incorrect amounts of income for the appellant's income and also for appellee's. It is inappropriate to count spousal support as income for the purpose of computing child support, seeParzynski v. Parzynski (1992), 85 Ohio App.3d 423. However, after the lump sum distribution, appellee's actual or potential income will increase because her net value has gone up by an amount in excess of $3,000,000. The trial court found appellant was able to manipulate his income to lower it during the pendency of the divorce. The court should include imputed income for each in its calculations pursuant to Marker v.Grimm, supra.
The Supreme Court has devised an abuse of discretion standard for reviewing courts to apply in looking to a trial court's determinations in a domestic relations case, see Booth v. Booth
(1989), 44 Ohio St.3d 142, 144. The Supreme Court made the abuse of discretion standard specifically applicable to awards of child support in Booth, supra. The Supreme Court has frequently defined the term abuse of discretion as implying the court's attitude is unreasonable, arbitrary, or unconscionable, see Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. InBooth, the Supreme Court reviewed a situation where the obligor on a child support order asserted because he resided in New York City, the court should have taken into account his higher cost of living, and should also have discounted the needs of the children as minimal in Guernsey County, Ohio. The Supreme Court found the child support guidelines provide a starting point for the court, but nevertheless, the common pleas court has inherent discretion to deviate from the guidelines when it finds it is appropriate to do so.
Although failure to comply with Marker v. Grimm, supra, is sufficient reason to reverse, other aspects of the court's decision require discussion as well.
It is certainly relevant to examine Ohio's Child Support Guidelines in light of the trial court's award. The States generally enacted child support guidelines in response to federal requirements, and the federal law requires the support obligation which is calculated to be presumed to be the correct amount needed to support the child, see 42 U.S.C. § 667(b). The federal legislation requires the states to allow the support obligation calculated under the guidelines to be rebutted upon a showing that the award is unjust or inappropriate in a particular case, Id. The Ohio guidelines go further than the federal requirements, and require the party challenging the support award to demonstrate the calculated award is not in the best interest of the child. R.C. 3113.215 (B). As Sharon J. Badertercher points out in her article Ohio Mandatory ChildSupport Guidelines: Child Support or Spousal Maintenance? 42 Case Western Reserve Law Review 297, Ohio's requirement sets a standard for rebuttal which can rarely be met by a non-custodial parent because it requires the parent, in effect, to convince the trial court that a higher award is not in the child's best interest. While the best interest requirement affects non-custodial parents on all levels of income, it becomes particularly problematic for the non-custodial parent with substantial income. As a practical matter, the higher earning non-custodial parents can seldom establish an obligation calculated under the support guidelines is in excess of the financial support actually needed to raise the child or show other factors which the trial court did not consider in its calculation would demonstrate a large award was inequitable. Although the Ohio guidelines include a calculation specifically directed to the actual needs of the child, the needs are defined in part in terms of parental income, under the theory the child is entitled to share in the wealth of the custodial and non-custodial parent, R.C. 3109.05.
The Ohio guidelines set forth a graduated scale for calculating the support obligations so that the awards are theoretically tailored to reflect the actual needs of the children and the respective parent's ability to meet those needs. When the parents have high incomes, however, the support obligation exceeds the amount actually required to provide for the needs of an average child. While admittedly, a large award benefits the child by giving him a stable and high standard of living, a portion of the award will benefit the custodial parent as well. As Badertercher points out, an insufficient award can easily be shown to be not in the best interest of the child, but an excessive award cannot be rebutted so easily. Thus, the amount of support calculated under a fixed percentage, as Ohio does with higher income levels, does not actually reflect average expenditures necessary to satisfy a child's needs at the income level, but the non-custodial parent cannot rebut the presumption favoring the formula even if all support in excess of that required to meet the child's basic needs could be attributed to maintaining the child's standard of living. One of the goals of the guidelines is to provide children with the financial resources they would have had if the parents were living together in the same household. It is not wrong per se to include an amount in the support obligation which is devoted to maintaining the child's standard of living, but when the parents' incomes are so disparate, as in the case at bar, the award has the effect of being less like child support and more like an equalization of the incomes of the two households. The custodial parent will benefit to a greater degree because the parent receives income not otherwise available to him or her, and because as the child's standard of living rises, so must the custodial parent's, 42 Case Western Reserve Law Review, at 321.
The problem becomes even more clear when the tax consequences of child support versus alimony are considered. If the award is characterized as child support, the custodial parent receives the income free of any tax liability, while alimony or spousal support is taxed as income to the recipient. Badertercher asserts:
 Even if it were possible to separate the amount of money attributable to the child's standard of living from that of the custodial parent, the concept of a child being entitled to a flat percentage of a parent's income is problematic generally. According to this theory, a child is entitled to enjoy certain benefits simply because the parent can afford to provide them. For middle and low income families, this notion is less problematic because all or most of the child support award is actually being used to meet the needs of the child. For high income families, however, a large portion of the award can be attributed to allowing the child the benefit from his parent's wealth beyond the amount necessary to meet the child's actual needs. Arguably, cases involving wealthy parents lead courts to step into the parent's shoes and make parenting decisions about the goods and privileges they will give their children.
 Id. at 322, citations deleted.
In the case at bar, the trial court found the parents and children had enjoyed a luxurious standard of living vastly different from that of most people, during the marriage. The court considered the disparity of the income between the parties and households, and expressly found it was inadvisable to place the ability to continue the luxurious lifestyle to which these children were born solely to the non-custodial parent's discretion. The court found this would create in the non-custodial parent a strong ability to manipulate the children's relationship with the non-custodial parent, as well as with the custodial parent. The court found the non-custodial parent here had exploited his wealth in the past and could use it in the future to create an unhealthy environment for the children. The court's findings of fact clearly demonstrate the court's intent was to equalize the mother's "bargaining position" and her resources.
R.C. 3113.215(B) sets forth various factors and criteria which the court must use in determining the award is unjust or inappropriate. The factors include:
(a) Special and unusual needs of the children;
 (B) Extraordinary obligations for minor children or obligations for handicapped children who are not stepchildren and who are not offspring from the marriage or relationship that is the basis of the immediate child support determination;
(c) Other court-ordered payments;
 (d) Extended times of visitation or extraordinary costs associated with visitation, provided that the division does not authorize and shall not be construed as authorizing any deviation from the schedule and the applicable worksheet in division (E) of this section, through line 24, or in division (F) of this section, through line 23, or any escrowing, impoundment, or withholding of child support because of a denial of or interference with a right of companionship or visitation granted by court order;
 (e) The obligor obtains additional employment after a child support order is issued in order to support a second family;
 (f) The financial resources and the earning ability of the child;
 (g) Disparity in income between parties or households;
 (h) Benefits that either parent receives from remarriage or sharing living expenses with another person;
 (i) The amount of federal, state, and local taxes actually paid or estimated to be paid by a parent or both of the parents;
 (j) Significant in-kind contributions from a parent, including, but not limited to, direct payment for lessons, sports equipment, schooling, or clothing;
 (k) The relative financial resources, other assets and resources, and needs of each parent;
 (l) The standard of living and circumstances of each parent and the standard of living the child would have enjoyed had the marriage continued or had the parents been married;
 (m) The physical and emotional condition and needs of the child;
 (n) The need and capacity of the child for an education and the educational opportunities that would have been available to the child had the circumstances requiring a court order for support not arisen;
 (o) The responsibility of each parent for the support of other;
(p) Any other relevant factor.
While the court alludes to the factors in its findings of fact, nevertheless, the clear import of the court's order is less focused on the children than it is an effort to control what the court perceives as inappropriate judgments and attitudes of the non-custodial parent in determining how he will spend what should be his own money. The court's order is less an award of support for the children's financial needs than an effort to allocate to the custodial parent the right to dictate how the non-custodial parent's personal money, which he might or might not chose to spend on the children, will be used.
While we will not substitute our judgment for the trial court regarding the discretionary determinations it must make in this case, nevertheless, we find the basis upon which the court began was flawed because the court used incorrect income amounts for both parties as a starting point in violation ofMarker v. Grimm, supra. In addition, the trial court's focus strayed from its polestar, the best interest of the children. Accordingly, we vacate the child support award, and we remand it to the trial court with instructions to compute the actual guideline amount using the corrected income amounts, before deviating if it finds it is in the best interest of the children to order an amount different from the guidelines.
The second assignment of error is sustained.
 III IV
In his third assignment of error, appellant argues the trial court's handling of the "Milligan receivable" was against the manifest weight of the evidence. The Milligan receivable is an account owed by George Milligan. During the marriage, appellant entered into an agreement to sell two augers and related equipment to Milligan in exchange for a note for $1,000,000. The balance due on the promissory note at the date of final hearing was stipulated to be $958,381. Mr. Milligan testified he believed he would be in a position to pay the note and the trial court found no credible evidence of inability to pay the obligation was offered at trial. The court added appellant apparently believed Milligan was solvent, because appellant lent him an additional $115,000 in early 1996. The trial court found the value of the promissory note is a marital asset.
Part of the $1,860,000 equalization payment appellant was ordered to pay appellee to equalize the property division, includes $479,190.50, given to appellee as her one-half of the value of the Milligan receivable.
Complicating matters, appellant signed as a guarantor on a $1,000,000 loan from a bank to Milligan. This apparently was part of the same transaction involved in the transfer of the promissory note. Several months after the final judgment in this case, Milligan declared bankruptcy pursuant to Chapter 7 of the United States Bankruptcy Code. Appellant asserts that according to the bankruptcy petition, the liabilities will exceed the assets in the bankruptcy proceeding at a ratio of approximately ten to one. Appellant also asserts there are insufficient assets to discharge the debt owed to appellant, which is unsecured. As guarantor, appellant is required to make payments to the bank on the loan, and he must pay appellee one half of the face value of the Milligan receivable.
Appellant argued to the trial court at trial the prospects for repayment were not good, and for this reason, the assets should not be valued as the face value of the note. After Milligan filed for bankruptcy, appellant brought his motion pursuant to Civ. R. 60 (B)(1). The Rule permits a court to relieve a party from a final judgment because of mistake, inadvertence, surprise, or excusable neglect. In GTE AutomaticElectric, Inc. v. ARC Industries, Inc. (1976), 47 Ohio St.2d 146, the Ohio Supreme Court held:
 2. To prevail on a motion brought under Civ. R. 60(B), the movant must demonstrate that: (1) the party has a meritorious defense or claim to present if relief is granted; (2) the party is entitled to relief under one of the grounds stated in Civ. R. 60 (B)(1) through (5); and (3) the motion is made within a reasonable time, and, where the grounds of relief are Civ. R. 60 (B)(1), (2) or (3), not more than one year after the judgment.
Syllabus by the court, paragraph two.
Appellant argued the determination of the value of the Milligan receivable was the product of a mistake on the part of the court and also on the part of counsel. As appellee points out, this is inconsistent with appellant's assertions, at trial, and here, that it should have been obvious to the court at the time of trial that Milligan was unable to repay the note, and in fact, appellant knew this as well.
We find the "mistake" referred to in Civ. R. 60 (B)(1) refers to mistakes made by one or both parties, see State ex rel.Citizens For Responsible Taxation v. Scioto County Board ofElections (1993), 67 Ohio St.3d 134. Mistakes by the court, on the other hand, are matters for appeal. Civ. R. 60 (B) is not a substitute for an appeal, Blasco v. Mislik (1992), 69 Ohio St.2d 684.
Accordingly, we reject appellant's argument the court should have sustained his motion brought pursuant to Civ. R. 60 (B).
Having said this, we find the trial court improperly valued the Milligan receivable based on a speculative amount. Although the court found there was no credible evidence demonstrating Milligan could not pay at all, nevertheless there was sufficient evidence presented to the trial court which should have put the court on notice the value of this receivable was speculative, and might not be the actual face value of the note. In accepting the face value as the actual valuation of the receivable, and then ordering appellant to pay appellee "up front" in the property settlement, the court's order resulted in appellee receiving an inflated amount for this marital asset.
We find although the trial court correctly found the Milligan receivable to be a marital asset, it erred in the valuation of the asset. Accordingly, the valuation amount is vacated, and the matter is remanded to the court for further proceeding.
The third assignment of error is sustained in part, and overruled in part.
 V
The trial court ordered appellant to pay appellee $200,000 which it found appellant had borrowed from appellee's separate funds towards the construction costs of the home. Appellee testified at trial the parties were in the process of building an expensive marital residence from marital funds, when appellant experienced a cash flow problem. Appellee alleged appellant borrowed some of her separate money, and promised to pay it back when business improved. Appellee wrote a check from funds appellant had given her in 1992, payable to a North Carolina lumber supplier.
Appellant points out he had no obligation to fund any of the construction costs of the marital home from his pre-marital assets or separate property.
Appellant argues if this was a loan at all, it was a loan to the marriage, because the funds went directly to the lumber supplier to defray the expenses associated with constructing the marital home. Appellee argues, especially in light of the fact appellant was awarded the home in the final property division, and because the trial court apparently believed appellee's testimony the appellant had promised to repay her the money, this court cannot reverse because the matter is directed to the trial court's sound judgment regarding the credibility of witnesses.
Issues of fact are for the trier of fact to determine, and the determinations of the trier of fact should be given deference by reviewing courts, see States v. DeHass (1967),10 Ohio St.2d 230.
We find the trial court erred in finding the $200,000 from appellee represented a loan to appellant personally, for which appellant was liable separately, rather than a loan to the marriage. The $200,000 should be treated as marital funds and split between the parties, so that appellee receives $100,000 from the distribution, rather than $200,000.
The fourth assignment of error is sustained.
 VI
The trial court found appellant owns debt free four parcels of real estate located in the business district of Coshocton, Ohio. All parcels were purchased as investment properties prior to the parties' marriage. The properties include the "Farmer's Exchange" building, worth $180,000, immediately prior to the marriage and $190,000 at the end of the marriage; the "Roof Lot" valued at $13,600 before the marriage and $13,600 at the end of the marriage; the "Stage Building" valued at $253,000 prior to the marriage and $205,000 at the time of divorce; and the "Maurice Building" valued at $225,000 prior to the marriage and $245,000 at the end of the marriage, as found by the trial court finding of fact No. 8. The trial court appropriately found these were appellant's separate properties because they were acquired prior to the marriage. The trial court found the appreciation value in the Farmer's Exchange property, and the Maurice Building were marital asserts. The court did not consider the depreciation of the Stage Building property as marital.
In Worthington v. Worthington (1986), 21 Ohio St.3d 73, the Ohio Supreme Court held a trial court may treat appreciation in value of a non-marital asset as a marital asset if significant marital funds and labor contribute to the improvement and maintenance of the property. Subsequent to Worthington, the legislative enacted R.C. 3105.171, codifying the rule inWorthington. R.C. 3105.171 defines the appreciation of separate property which is due to the labor, monetary, or in kind contribution of one or both spouses as marital property.
Here, it was undisputed the buildings were appellant's separate property, and was undisputed appellant expended time and money to the maintenance of the buildings. Appellant asserts he was compensated for his efforts in maintaining the buildings, and appellee shared in the compensation. Appellant urges the appreciation of the buildings during the marriage should be treated as his separate property.
If appellant had produced evidence at trial that the appreciation was passive appreciation and not due to his labor, then a trial court could, in the exercise of its discretion find the appreciation was non-marital. Here, the record does not demonstrate appellant did so, and we find the clear language of the statute controls.
We find the trial court did not err in finding the appreciations on these properties constituted marital property.
However, we also find equity demands that appreciation and depreciation be treated similarly. If the properties' appreciation is a marital asset, then the properties' depreciation ought also to be factored in before distribution. The trial court cited Tanagho v. Tanagho (December 30, 1993), Franklin App. No. 93AP-1089, unreported. In this case, the trial court reviewed the value of the husband's real estate holdings, and determined the appreciation in value was a marital asset, and depreciation in some of the values constituted a marital loss. The trial court off set the marital appreciation on the property against the marital losses, and because the losses exceeded the gains, the court concluded there was no net marital property to divide between the parties. The court then awarded all the interest in the properties to the husband, who had held them as separate property.
The Franklin County Court of Appeals reversed the trial court's finding in Tanagho, holding R.C. 3105.171 speaks only to appreciation in separate properties, and not to depreciation. The court of appeals concluded it is contrary to Ohio Statutory Law to offset depreciations against appreciations.
We cannot agree with the Tenth District's holding. It seems to us only equitable the parties should share any losses just as they share in any gains. To hold otherwise gives appellee a lop-sided marital interest, wherein she can only profit, and never lose, regardless of what happens to the holdings during the marriage. We find, to the contrary, the marriage itself should bear the risk of investments, and should profit or lose depending upon the appreciation or depreciation. We conclude the trial court improperly computed the value of this marital asset.
The sixth assignment of error is sustained.
We turn now to appellee's cross-assignments of error.
 I
In her first assignment of error, appellee/cross appellant argues the trial court failed to properly identify and divide all of the marital appreciation of the husband's separate property, including certain business interests known as "Bryco", "Brydet", "Ohio Amco", "Westlo", and "Circle Fighting". The trial court found these properties are the husband's separate property, and found there was no appreciation in the value of any of these separate property assets as a result of labor, efforts, or money expended by either party during the marriage. The court concluded no part of any of the named businesses was marital, and awarded all the business interest to appellant as his separate property. The trial court added it would value the properties together because of the interrelated business transactions amongst the various entities.
Appellee/cross appellant asks us to apply Tanagho, supra, and to separate out all the depreciated separate property, and count only the appreciation, which she asserts should have been treated as a marital asset. Because we reject the reasoning ofTanagho, supra, see Vl, supra, we find the trial court correctly treated all the properties as interrelated, and took their net value, computing both the appreciations and the depreciations, and arrived at the correct determination that the properties' value, taken as a whole, has not changed.
The first cross-assignment of error is overruled.
 II
Our discussion of appellant's II, supra, disposes of this assignment of error as well.
The second assignment of error is sustained.
 III
In her third assignment of error, appellee/cross appellant argues the trial court improperly valued the parties' marital residence. The parties were in the process of constructing the residence during the marriage. This property had been intended initially by the parties to be used as a marital residence.
Appellant's expert placed a value on the new marital residence of $1,105,651, plus a value of $125,000 for the original farmhouse located on the property. Appellee's appraiser valued the entire parcel at $1,500,000.
Appellee urges us to reject both these fair market valuations. She argues the actual cost incurred to build the marital residence was $2,861,608. She urges the value of the home as determined by using the fair-market approach is inequitable because of the vast marital assets used to construct the residence, from which appellant has solely benefited because he was awarded the house. Appellee also points out the replacement cost of the residence is $2,400,000.
Appellee points out the parties spent this large amount of money based on the house's aesthetic value to them, rather than on the re-sale value. However, if appellant sold this property, he would realize far less than this aesthetic value. InMyers v. Myers (August 21, 1992), Licking App. No. 92CA13, unreported, this court reviewed a situation where the appraiser's report valued the subject property at $45,000, but the valuation by cost approach yielded the value of $65,800. The appraiser suggested the fair market value of the property results in the best estimate of the market place value. The common pleas court selected the higher figure as the market value prior to distributing the assets. This court reversed, noting while the trial court has broad discretion in dividing marital property, it must take care in computing this value.
We find the trial court did not err in using the fair market value approach to value this property rather than the cost valuation approach. Where, as here, aesthetic and other subjective considerations would highly inflate the value of the property a trial court properly applies the fair market standard as the most objective standard.
The third assignment of error is overruled.
 IV
In her fourth assignment of error, appellee/cross-appellant argues the trial court should have awarded her benefits from certain coal reserves on property held by the parties. In its finding of fact number six, the trial court found the parties own 280 acres of real estate, of which approximately 240 were pre-marital property. Approximately 40 acres were purchased during the marriage, and had a value of $40,000 at the time of the divorce. The court took evidence that the coal reserves on this real estate might generate a substantial profit, but the value was too speculative because the quality of the coal reserves made mining unfeasible in the near future. Appellant testified the profit could be as much as $600,000, but at this point in time, the current air standards prohibited use of coal with a high sulphur content, such as that found on the property.
Appellee argues because the court believed appellant's testimony that the value of the asset was speculative, it declined to apportion the marital appreciation of this asset, even though marital efforts went into securing and developing this property.
Our review of the record leads us to conclude the trial court correctly found, from the evidence presented, that the value of these unmined coal reserves was too speculative to allocate anything as marital appreciation.
The fourth assignment of error is overruled.
 V.
In her fifth assignment of error, appellee/cross appellant argues the trial court should have ordered appellant to pay interest on the monies it awarded to her in the property division. The court ordered appellant to pay appellee the sum of $1,860,324 within sixty days of the date of the judgment. Appellee argues pursuant to R.C. 1343.03, interest should run at a rate of ten percent per year after the time in which the money became due and payable. She argued at that rate, she is losing $186,032.40 per year on money which appellant owes her.
Appellant cites us to Koegel v. Koegel (1982), 69 Ohio St.2d 355, wherein the Ohio Supreme Court held it is a matter within the broad discretion of the trial court to determine whether it is appropriate to award interest upon obligations arising out of the division of marital property.
On authority of Koegel, supra, the fifth assignment of error is overruled.
For the foregoing reasons, the judgment of the Court of Common Pleas of Coshocton County, Ohio, is affirmed in part and reversed in part, and the cause is remanded to that court for further proceedings in accord with law and consistent with this opinion.
By Gwin, J., Farmer, P.J., and Hoffman, J., concurs in part and dissents in part.
--------------------
--------------------
 -------------------- JUDGES